KATHLEEN McMANAMON, Petitioner-Appellant, v. THE RETIREMENT BOARD OF THE POLICEMEN'S ANNUITY AND BENEFIT FUND OF THE CITY OF CHICAGO, Respondent-Appellee.

First District (5th Division)   No. 1—97—1376

Opinion filed August 7, 1998.

Thomas J. Pleines, of Chicago, for appellant.

David R. Kugler, of Chicago, for appellee.

JUSTICE HOURIHANE delivered the opinion of the court:
Petitioner, Kathleen McManamon, appeals from an order of the circuit court affirming a decision of the Retirement Board of the Policemen's Annuity and Benefit Fund for the City of Chicago (Board), denying her duty disability benefits (40 ILCS 5/5—154 (West 1996)).

McManamon argues that the Board's decision is against the manifest weight of the evidence and that the Board violated the provisions of section 5—156 of the Pension Code (40 ILCS 5/5—156 (West 1996)), depriving her of a fair trial.

We affirm.

## BACKGROUND

On November 6, 1994, McManamon, a Chicago police officer, filed a claim with the Board seeking duty disability benefits in connection with injuries she sustained during an on-duty altercation on October 17, 1993. At the evidentiary hearing before the Board, McManamon testified that she was appointed to the police force on November 29, 1982. On October 17, 1993, while performing her duties as a patrol officer, she was involved in an altercation in which she was struck in the chest and fell backward, landing on her buttocks, twisting her left knee, and striking her head on the sidewalk. At the hospital, she was given a pain killer and discharged. At the time, she had pain in her left ankle, left knee, back, head, and neck. McManamon did not return to work following this injury and, on January 31, 1994, she was involved in an off-duty altercation in which she sustained a fractured nasal bone, a fractured right clavicle, and a concussion.

Following the 1993 injury, the police department's medical section sent McManamon to Dr. Fahrenbach. She complained of neck pain, low back pain, and numbness in two fingers on her right hand. In November 1993, Dr. Fahrenbach prescribed MRIs of her cervical spine and left knee. The MRI of the knee was normal; the MRI of the spine revealed a disc herniation at C5-C6. Prior to the 1994 injury, Dr. Fahrenbach did not give her any indication as to whether he thought she was progressing toward returning to work. Her back pain was getting progressively worse and, in the third week of January 1994, he had recommended an MRI.

McManamon further testified that in February 1995, she was referred by the Board to Dr. Akkeron. McManamon disagreed with the results in Dr. Akkeron's report that she "has a full neck flexion, extension, left and right rotation, and lateral bending." She also testified that his finding in his report that none of these motions caused any pain, muscle tightness or spasm was in error.

Following her examination by Dr. Akkeron, McManamon saw Dr. Fahrenbach several times. He has told her that if she returns to work and sustains another neck injury, she would probably have permanent damage to some nerves.

At the time of the hearing, McManamon was a full-time student in the veterinary school at the University of Illinois in Champaign, which

she began in August 1994. Other than exercises for her lower back, she does not engage in any physical activities. She continues to have numbness in her right hand, limited range of motion in her neck, and pain in her neck and low back. She has trouble straightening up after sitting for long periods of time and cannot run or go down stairs without back and neck pain.

Dr. Alfred Akkeron, an orthopedic surgeon, testified that he examined McManamon on February 9, 1995. The appointment was made by the Board. He took a history, did a physical examination, a neurologic examination, and reviewed her prior medical file. Dr. Akkeron opined that McManamon could return to full duty.

Dr. S. David Demorest, the Board's physician, testified that he examined McManamon on December 28, 1994. It was his opinion that, prior to the 1994 injury, her condition was improving, that objective evidence supporting her subjective complaints was lacking, and that she could return to work. However, he enlisted the aid of Dr. Akkeron, whom he has known for 10 or 12 years.

Dr. Gregory Fahrenbach, an orthopedic surgeon, first saw McManamon on October 18, 1993. His examination confirmed her complaints. She had loss of motion in her neck, loss of motion in her back with spasms, and a swollen left knee. Dr. Fahrenbach prescribed an anti-inflammatory medication, a muscle relaxant, and physical therapy. He saw her five times during 1993.

According to Dr. Fahrenbach, on January 21, 1994, McManamon was still complaining of low back discomfort, difficulty with her neck, and some loss of motion in her back and neck. He ordered an MRI of her lumbar spine but, before she could obtain the scan, she was involved in another altercation, *i.e.*, the January 31, 1994, incident. Dr. Fahrenbach subsequently treated McManamon, beginning February 1, 1994, for multiple contusions, head trauma, and a fracture of her right clavicle.

Dr. Fahrenbach's notes of May 9, 1994, indicate that there was adhesive capsulitis, *i.e.*, a scarring of the shoulder joint preventing movement. This was a consequence of the delayed healing of the clavicle fracture. X rays taken in August 1994, revealed that the clavicle was still healing and that range of motion in her shoulder was limited. Throughout this period, McManamon still had problems with neck pain and back discomfort. In November 1994, McManamon was still complaining of some back pain.

Dr. Fahrenbach saw McManamon a few times in 1995. In March, 1995, she still had loss of motion of her right shoulder, neck, and back. In Dr. Fahrenbach's opinion, based on MRI findings identifying cervical and lumber disc problems, McManamon could not return to work at this time except in a sedentary capacity.

He last saw McManamon in January 1996. Not much had changed since March 1995. He does not believe she is a malingerer, as her subjective complaints have been substantiated by clinical exam, X ray, MRI and other tests.

Most of Dr. Fahrenbach's reports beginning in February 1994 focused on the clavicle fracture. He testified that it is difficult to distinguish between shoulder pain and radiating neck pain and that he was not sure why McManamon was having the problems with her fingers. It could ·be from the clavicle fracture, as a lot of clavicle fractures include head and neck trauma.

The Board found that McManamon was disabled but that the disability was not duty related, having arisen out of the nonduty January 1994 altercation. Accordingly, the Board granted McManamon a 50% ordinary disability benefit. 40 ILCS 5/5—155 (West 1996). The circuit court affirmed the Board's decision and this appeal followed. 735 ILCS 5/3—112 (West 1996); 155 Ill. 2d R. 301.

## ANALYSIS

### I

McManamon first argues that the Board's decision is against the manifest weight of the evidence in that there is no evidence supporting the Board's conclusion that her inability to return to work resulted from injuries received in the nonduty incident of January 31, 1994.

Factual findings and conclusions of an administrative agency are held to be *prima facie* true and correct (735 ILCS 5/3—110 (West 1996)) and will be upheld on review unless they are against the manifest weight of the evidence. *Robbins v. Board of Trustees of the Carbondale Police Pension Fund*, 177 Ill. 2d 533, 538, 687 N.E.2d 39 (1997); *Antonelli v. Board of Trustees of the Hillside Police Pension Board*, 287 Ill. App. 3d 348, 352, 678 N.E.2d 773 (1997). A decision of an administrative agency is against the manifest weight of the evidence only where the opposite conclusion is clearly evident. *Robbins*, 177 Ill. 2d at 538. An administrative decision will not be set aside merely because a reviewing court would have ruled otherwise or because a different conclusion is reasonable. *Robbins*, 177 Ill. 2d at 538; *Antonelli*, 287 Ill. App. 3d at 352. Thus, if there is any competent evidence supporting the agency's determination, affirmance is required. *Robbins*, 177 Ill. 2d at 538; *Samuels v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 289 Ill. App. 3d 651, 660, 682 N.E.2d 276 (1997).

According to McManamon, her current symptoms are numbness in her right hand in the little and ring fingers, limited range of motion in her neck, neck pain, and low back pain. According to Dr. Fahren-

bach, she also has limited range of motion in her right shoulder and back. Before considering each symptom, we observe, as the Board did, that Dr. Fahrenbach's notes beginning in February 1994 focus primarily on the fractured clavicle. This suggests that McManamon's 1993 injuries required significantly less medical intervention during 1994 and subsequent periods.

As to particular symptoms, Dr. Fahrenbach testified that the tingling in the fingers on McManamon's right hand could be from the clavicle fracture. While he did not testify that McManamon's neck pain could also be caused by the clavicle fracture, he did testify that such fractures involve head and neck trauma:

> "You fall down, you hit your shoulder, hit your head, hit your neck, and all the structures there, the bone structures, the nerves, the tendons, all that becomes involved."

As to McManamon's low back pain, the testimony was conflicting. Dr. Fahrenbach testified that the MRIs taken in 1993 and other tests substantiate her claims of low back pain. However, Dr. Demorest testified that, based on his review of McManamon's medical history, prior to the 1994 altercation, her overall condition was improving. Further, despite McManamon's testimony of continuing low back pain and difficulty straightening up after long periods of sitting, her condition did not prevent her from attending veterinary school as a full-time student.

Finally, as to McManamon's loss of motion in her right shoulder, it is unquestionably the result of the clavicle fracture.

■ It is for the administrative body to weigh the evidence, make credibility determinations, and resolve any conflicts in the evidence. *Iwanski v. Streamwood Police Pension Board*, 232 Ill. App. 3d 180, 184, 596 N.E.2d 691 (1992); *Nichols v. Department of Employment Security*, 218 Ill. App. 3d 803, 809, 578 N.E.2d 1121 (1991). It is not this court's prerogative to reweigh the evidence or substitute its judgment for that of the Board. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88, 606 N.E.2d 1111 (1992); *Ryndak v. River Grove Police Pension Board*, 248 Ill. App. 3d 486, 489, 618 N.E.2d 606 (1993). Further, a mere conflict in the evidence is an insufficient basis on which to reverse. *Nichols*, 218 Ill. App. 3d at 809. Given the nature of the record before this court, it cannot be said that the Board's conclusion that McManamon's current disability is unrelated to the October 1993 on-duty altercation is against the manifest weight of the evidence.

## II

McManamon next argues that even if this court affirms the

Board's finding that her disability resulted from the January 31, 1994, injuries, she is entitled to duty disability benefits because she was performing an "act of duty" on that date. See 40 ILCS 5/5—113 (West 1996).

■ McManamon never argued before the Board that the injuries she sustained in the January 1994 off-duty altercation were the basis for her claim of duty disability. According to the record, the affidavit McManamon submitted in support of her claim refers only to the October 1993 incident. Further, although some limited testimony as to the January 1994 incident was offered by McManamon upon questioning by the Board's counsel, it is apparent that McManamon was not relying on the 1994 incident as the basis for her claim and never suggested that the Board should find that she was performing an "act of duty" at that time. Rather, McManamon raised this argument for the first time before the circuit court, a fact the Board noted in its brief before that court:

> "McManamon in her brief now attempts, for the first time, to color [t]he January 1994 event as [an] 'act of duty' incident. The Court is limited to what is in the record, and not to the wishful thinking of McManamon raised as an afterthought."

We agree with the Board that McManamon's arguments before the circuit court were necessarily limited to those raised before the Board. Any argument not raised before an administrative body will be deemed waived and cannot be asserted on judicial review. *Jackson v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 293 Ill. App. 3d 694, 698, 688 N.E.2d 782 (1997); *Board of Education v. Illinois Educational Labor Relations Board*, 289 Ill. App. 3d 1019, 1021, 682 N.E.2d 398 (1997). Accordingly, we find that McManamon waived consideration of whether the January 1994 injuries were sustained during the performance of an act of duty.

### III

■ Finally, McManamon contends that she was denied a fair hearing in that the Board's introduction of testimony from Dr. Akkeron violated the provisions of section 5—156 of the Pension Code (40 ILCS 5/5—156 (West 1996)). This section states in relevant part:

> "Proof of duty or ordinary disability—Physical examinations. Proof of duty or ordinary disability shall be furnished to the board by at least one licensed and practicing physician appointed by the board. In cases where the board requires an applicant to get a second opinion, the applicant must select a physician from a list of qualified licensed and practicing physicians who specialize in the various medical areas related to duty injuries and illnesses, as established by the board. The board may require other evidence of disability." 40 ILCS 5/5—156 (West 1996).

Prior to the hearing before the Board, McManamon filed a motion to exclude the testimony of Dr. Akkeron. McManamon asserted that she was required to undergo an examination by Dr. Demorest, the Board's physician, and that Dr. Demorest sought a second opinion from Dr. Akkeron. McManamon argued that, contrary to section 5—156, she was never offered an opportunity to select a physician from a list prepared by the Board. Without explanation, the Board denied the motion.

The Board argued before the circuit court, as it does on appeal, that it is not restricted under section 5—156 from seeking the opinions of other doctors and that only when the applicant has submitted her own medical report and the Board then requests the applicant to get a second opinion must the applicant be allowed to pick the physician from a list established by the Board. The circuit court was "inclined to believe that the better interpretation is that of the Board." We cannot agree.

■ Interpretation of a statute is a question of law. *Branson v. Department of Revenue*, 168 Ill. 2d 247, 254, 659 N.E.2d 961 (1995). While the interpretation of a statute by the agency charged with its enforcement is relevant, it is not binding on this court and review proceeds *de novo. Branson*, 168 Ill. 2d at 254.

■ The primary rule of statutory construction is to ascertain and give effect to the intent of the legislature, such inquiry necessarily beginning with the language used in the statute. *Bogseth v. Emanuel*, 166 Ill. 2d 507, 513, 655 N.E.2d 888 (1995). We note that the Board's interpretation rests on language not found in the statute, a fact the Board admits:

> "[A]lthough there is nothing in Section 5/5—156 requiring an Applicant to obtain his or her own medical report supporting the disability claim, *if* such a report is produced, *then* [t]he Board can insist that the Applicant seek a second opinion from a doctor who specializes in the injury or disability claimed by the Applicant." (Emphasis original.)

Had the legislature intended, as the Board maintains, to permit an applicant to choose the physician from whom a second opinion will be obtained only where the applicant first submits her own medical report, the legislature was free to do so. However, it did not, and we decline, under the guise of statutory construction, to read such language into the statute.

Further, under the Board's interpretation, an applicant could be referred by the Board to any number of practitioners for second opinions as to various aspects of the applicant's medical condition, yet the provisions of section 5—156 would never be triggered because the

Board did not request the applicant, herself, to seek a second opinion. The Board's interpretation effectively does an end run around the statute.

The statute plainly provides that proof of disability be furnished to the Board by at least one physician appointed by the Board and that where "the board requests an applicant to get a second opinion, the applicant *must* select a physician" from an appropriate list. (Emphasis added.) 40 ILCS 5/5—156 (West 1996). The word "must" is indicative of a mandatory duty. *A.Y. McDonald Manufacturing Co. v. State Farm Automobile Insurance Co.*, 225 Ill. App. 3d 851, 855, 587 N.E.2d 623 (1992). We find, based on the language in the statute, that such duty is triggered any time the Board seeks a second opinion, *i.e.*, an opinion in addition to the one necessarily provided by the Board-appointed physician.

Here, it is undisputed that Dr. Demorest, the Board's physician, referred McManamon directly to Dr. Akkeron for a second opinion and that McManamon was deprived of the opportunity to select a physician from a list provided by the Board. The Board's conduct violated section 5—156 and Dr. Akkeron's testimony should have been excluded. The Board's conduct does not, however, provide a basis for reversal. Even in the absence of Dr. Akkeron's testimony, the Board's conclusion, that McManamon's disability is not related to the October 1993 incident, finds support in the record. Thus, although the Board erred by failing to exclude Dr. Akkeron's testimony, we do not find that McManamon was prejudiced thereby or that the outcome of the hearing would have been any different had her motion to exclude been granted.

For the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

HOFFMAN, P.J., and HARTMAN, J., concur.